1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  UNITED STATES OF AMERICA,              No. 2:13-cr-0366-KJM

12              Plaintiff,                 ORDER

13       v.

14  DASHAWN WILLIAMS,

15              Defendant.

16  _____

17          Defendant Dashawn Williams has moved to dismiss the criminal indictments

18  against him for carjacking, possession of a firearm in furtherance of a crime of violence, felon in

19  possession of a firearm and a related forfeiture allegation for "any firearms and ammunition

20  involved or used in the knowing or willful commission of the [other three] offenses."  ECF No. 1

21  at 1-4; ECF No. 187.  Williams asserts the government has withheld or failed to preserve

22  evidence in violation of the Federal Rules of Criminal Procedure, a previous discovery order and

23  the Fifth and Sixth Amendments to the U.S. Constitution. *See* ECF No. 187 at 6, 8.  For the

24  reasons set forth below, the court DENIES Williams's motion to dismiss.

25  I.      PROCEDURAL BACKGROUND

26          On November 7, 2013, the United States adopted this case from local law

27  enforcement, and Williams was indicted by a federal grand jury for carjacking, possession of a

28  firearm in furtherance of a crime of violence, felon in possession of a firearm and a related

1

forfeiture allegation for "any firearms and ammunition involved or used in the knowing or willful commission of the [other three] offenses." ECF No. 1 at 1-4. Williams moves now to dismiss the entire indictment based on alleged violations of Federal Rule of Criminal Procedure 16 and the Fifth and Sixth Amendments. As well as a magistrate judge's discovery order. Mot. at 1, ECF No. 187. The government opposes, (Opp'n, ECF No. 191), and Williams has replied. Reply, ECF No. 192. The court heard testimony in multiple evidentiary hearings as reviewed below, admitted documentary evidence and considered Williams's pro se filing. *See* ECF Nos. 199, 200, 201, 205-1, 207, 227. The court also heard oral argument on this motion. ECF No. 207.

Williams originally based the motion on three unavailable pieces of evidence: unpreserved street camera video footage of the crash intersection, additional information about an unidentified witness who informed Vallejo Police Officer Ritzie Tolentino the suspect was running west on Louisiana Street and the undisclosed names of Vallejo Police Department helicopter pilots. *See* Mot. at 7-10. Williams also submitted a pro se filing reiterating arguments in his motion about the government's withholding information about the "relevant eye witness" who informed Tolentino the suspect was running west on Louisiana Street. ECF No. 227 at 1-3.

At hearing, Williams's counsel has confirmed that the names of the helicopter pilots are no longer subject to this motion. ECF No. 233; *see also* Opp'n at 9 ("Defendant next complains that the Government has not provided information about the air-surveillance pilots and footage from that surveillance. It has."). The court therefore resolves the motion as to the other two pieces of evidence: street camera video footage of the crash intersection and information about the unknown witness who informed Tolentino the suspect was running west on Louisiana Street.

Williams raises four legal grounds in support of his motion to dismiss the indictment: violation of Federal Rule of Criminal Procedure 16(a)(1)(E), violation of the government's duty to disclose evidence under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), violation of a discovery order of the magistrate judge (ECF No. 182) and failure to preserve evidence under *California v. Trombetta*, 467 U.S. 479 (1984), and *Arizona v. Youngblood*, 488 U.S. 51 (1988).

2

1    The magistrate judge's discovery order is dated June 14, 2017.  Magistrate Judge

2    Edmund F. Brennan issued an order to address Williams's pending discovery motion.  ECF

3    No. 182.  In that order, Judge Brennan required the government to "ask the Vallejo Police

4    Department to identify the officers who are recorded in the police dispatch record that has been

5    produced, and to confirm the identity of the witness referenced in the record."  *Id.* at 1.

6    Additionally, the magistrate judge ordered the government to "determine whether it has the

7    witness's contact information and if not," to "take reasonable steps to find that information."  *Id.*

8    The magistrate judge required the government to produce responsive information to Williams's

9    counsel, but stated the government "is not obliged to conduct any substantive interviews on

10   [Williams's] behalf."  *Id.*

11   II.    FACTUAL BACKGROUND

12          A.  Overview of Incident Underlying Indictment

13                  On August 23, 2013, Vallejo Police Department Officers Jesse Hicks and Jared

14   Jaksch responded to a call from police dispatch about a carjacking and a hit-and-run collision.

15   Hr'g Tr. (Aug. 23, 2017) at 15:19-16:1, 16:10-25 (Hicks Test.), ECF No. 199.  The carjacked

16   vehicle was a 1995 Blue Ford Mustang.  *Id.* at 19:3-5.  The vehicle crashed at the intersection of

17   Tennessee Street and Broadway Street.  *See* Ex. 7; ECF No. 174-1 at 46; ECF No. 186; Hr'g Tr.

18   (Aug. 30, 2017) at 146:22-23, 147:8-10 (Greenberg Test.), ECF No. 201.  At the scene of the

19   collision involving that vehicle, the carjacking victim, Adam G., contacted Hicks.  Hr'g Tr. (Aug.

20   23, 2017) at 24:9-15 (Hicks Test.).  Adam G. provided a description that was "relatively the same

21   that we already had through our dispatch and what Officer Greenberg radioed. . . . a black male,

22   gray sweatshirt or hoodie, approximately 5'9", 150, 160 pounds, and that he possessed a silver-

23   barreled, black-handled handgun," which Adam G. "thought could either be a Ruger or a Glock,

24   or something similar that looked like that."  *Id.* 24:16-24; *see also* Ex. 3 at 4; ECF 174-1 at 13.

25   The court provides a portion of Exhibit 7, a map of the area, for context:

26

27

28

                                         3



Ex. 7; *see also* ECF No. 186 (showing Broadway Street running north to south, Tennessee Street running west to east, and Louisiana Street below Tennessee Street running west to east; drawn asterisk showing location of barbershop at 1029 Tennessee Street, more than one block but less than two blocks away from the crash location, as filed by the government).

Vallejo Police Officers Jodi Brown and Robert Greenberg also responded to the carjacking incident, heading to the crash scene at Tennessee Street and Broadway Street. H'rg Tr. (Oct. 4, 2017) at 8:24-9:2, 11:6-14 (Brown Test.), ECF No. 207. Brown and Greenberg walked eastbound on Tennessee Street based on "witnesses saying that the suspect had fled that way." *Id.* at 11:22-12:3; *see also id.* at 20:21-21:5. From testimony based on Brown's post-arrest report, Brown and Greenberg encountered a witness, Miguel C., who was near the scene of the collision. *Id.* at 12:10-12, 13:10-12, 13:18-20. Miguel C. stated he saw "a black male adult wearing a gray hoody and blue jeans crash into his car then crash into another car, then that same person fled out of the driver's seat of the vehicle eastbound on Tennessee Street, went inside of a barbershop on Tennessee Street," and then that person "ended up . . . shortly after that just walking casually on Tennessee Street," but Miguel C. "did not know where he went after that

4

. . . ." *Id.* at 12:22-13:3, 21:8-11 (Brown Test.). According to another witness, Miguel C. had been "chasing a man that ran from the blue Mustang eastbound on Tennessee Street." H'rg Tr. Aug. 30, 2017) at 170:12-17 (Greenberg Test.). That witness, Denise H., was a passenger in one of the cars struck by the blue Mustang, and had also identified the suspect as a single black male in a "gray hoodie." *Id.* at 147:18-19, 149:20-150:3.

Officer Greenberg radioed that the suspect "was being chased by a witness, and [the suspect's] direction was eastbound on Tennessee." Hr'g Tr. (Aug. 23, 2017) at 21:22-24 (Hicks Test.). Officer Greenberg had also radioed the information he received from Miguel C., that the suspect ran into the barbershop, which was three blocks away from Tennessee Street just east of Monterey Street. *Id.* at 22:1-15 (Hicks Test.); H'rg Tr. (Aug. 30, 2017) at 153:18-21 (Greenberg Test.). Hicks, Jaksch and a third officer walked to the barbershop after receiving Greenberg's information. Hr'g Tr. (Aug. 23, 2017) at 27:22-23 (Hicks Test.). At this time, Hicks understood the suspect had short hair and no dreads, was a black male adult between 20 and 30 years old, and was 5'9" and between 150 and 160 pounds. *Id.* at 28:5-12. Hicks also recalled the suspect's clothing was described as a gray hoodie with blue jeans, and witnesses said the suspect possessed a silver-and-black handgun. *Id.* at 28:13-21.

As the officers approached the barbershop, two individuals exited the shop, and one "was pointing into the barbershop." *Id.* at 27:24-28:4 (Hicks Test.). Jaksch recalled one of these individuals, "the female . . . looking frightened and pointing towards the . . . barbershop." *Id.* at 99:10-12 (Jaksch Test.). Jaksch overheard the other individual, a male, "talking on the phone" and stating, "'a guy had run in the store,' 'he is refusing to leave.'" *Id.* at 99:14-17. Jaksch entered the barbershop and observed an individual taller than him, standing approximately 6'4" tall. *Id.* at 101:4-13; Ex. 3 at 6. Hicks also entered the barbershop and observed a second individual in the barbershop, testifying that "the [physical] description matched. He was about the same height, same weight, short black hair . . . ." *Id.* at 32:1-5 (Hicks Test.). Hicks stated that if he "remember[ed] correctly," the other individual, the one Jacksch "dealt with," "was taller," or "[s]omewhere in the neighborhood of six feet." *Id.* at 32:17-25 (Hicks Test.). Hicks "immediately ordered [the shorter individual] to the ground to comply," and another officer

handcuffed this individual, who was Dashawn Williams, the defendant here. *Id.* at 33:3-5. Hicks located a "semi-automatic handgun" with a "silver slide, black handle" in Williams's front waistband after patting down the waistband. *Id.* at 33:7-17.

Officer Jaksch learned the taller individual he encountered "was an employee." He also noticed "a gray, hooded sweatshirt on the ground," and learned "the sweatshirt did not belong to [the employee] and had not been in there prior to the other subject entering." *Id.* at 102:15-21 (Jaksch Test.). Jaksch also spoke with the man who was talking on his phone earlier while exiting the barbershop, Joel W., and learned Joel W. also worked at the barbershop. *Id.* at 103:1-6. According to Joel W., these two employees "had been inside working when this man came running in with a gun." *Id.* at 103:4-8 (Jaksch Test.). Joel W. also told Jaksch that "the man with the gun ran towards the back of the store but could not gain access," the man "refused to leave," and Joel W. "asked him to unload the gun if he was going to stay in the store." *Id.* at 103:9-14. The man "agreed and unloaded the gun, which contained a single, live bullet" and "handed it over to [Joel W.]." *Id.* at 103:16-18. Eventually, the man "demanded the bullet back" so "he could shoot the next person that walked in the door," but Joel W. "did not give him the bullet back." *Id.* at 103:20-23 (Jaksch Test.). Joel W. had not seen the gray hooded sweatshirt observed in the barbershop by Jaksch. Ex. 3 at 6.

After Williams's arrest, Miguel C. identified Williams from 30 feet away in daylight, while Williams was handcuffed and near a police car with armed, uniformed officers beside him. Miguel C. stated, "Yes, that looks like him. His face looks the same. I think that's him." H'rg Tr. (Oct. 4, 2017) at 17:4-17, 18:1-4 (Brown Test.); *see also* Hr'g Tr. (Aug. 30, 2017) at 160:18 (Greenberg testifying that Miguel C. said, "That looks like his face, I think that's him."). Denise H., who viewed Williams under similar circumstances as Miguel C., "couldn't remember if that was him or not." H'rg Tr. (Aug. 30, 2017) at 162:17-21 (Greenberg Test.). Adam G., the victim, later viewed a "standard six pack" photo lineup, "looked at the photos and said none of the photos [sic] skin color was right and none of the hair line looked right." Ex. 2 at 3; ECF No. 174-1 at 33. Additionally, Adam G. "then stated the suspect was short and the males

in the photos looked taller" despite the lineup's containing "only their head shots."  Ex. 2 at 3-5; ECF No. 174-1 at 33-35.

B.  <u>Street Video Camera Footage of the Crash Intersection</u>

Officer Hicks testified about a traffic or street camera at the intersection of Tennessee and Broadway, the intersection of the crash scene.  Hr'g Tr. (Aug. 23, 2017) at 46:21-47:1.  In addition to testifying he was aware of such a camera and acknowledging the camera records events that occur at the intersection, Hicks stated he "did not" check the camera for any video footage of the collision.  *Id.* at 46:24-47:7.  Hicks also testified he had no idea whether the street camera was working that day, if the camera was pointed in the right direction on the day of the incident, if the camera's view was obscured or if there were maintenance problems with the camera.  *Id.* at 63:19-22, 64:3-12.  Hicks acknowledged maintenance problems do occur with street cameras.  *Id.* at 64:13-14.

In a December 5, 2013 interview with Bureau of Alcohol, Tobacco, Firearms and Explosives (BATF) Special Agent Paula Vallerga, Officer Jacksch stated "there are some cameras at different locations and/or intersections throughout the city of Vallejo."  Ex. C at 2 (BATF interview of Officer Jared Jaksch, Dec. 5, 2013).  Jaksch "believed that there may be one at the intersection of Broadway and Tennessee," but "[h]e stated that they don't often work and that he cannot recall if it was checked for any recording of the incident."  *Id.*  Jaksch provided contact information for Greg Taylor, the Vallejo Police Department's IT Manager on the date of the carjacking.  *Id.*

The parties stipulated to Mr. Taylor's testimony.  Taylor Test. ¶ 2, ECF No. 200. Taylor was responsible for public safety cameras as part of the police department's information technology systems.  *Id.*  Taylor confirmed there is a "street video camera at Broadway and Tennessee in Vallejo, California," that "camera was there in August 2013" and this camera was one of several in Vallejo.  *Id.* ¶ 5.  According to Taylor, "[o]ne of the purposes of the camera is for police use for investigation of crimes."  *Id.*  However, "[t]here is no way to know definitively whether . . . the street camera was functioning at the time [of the incident] on Aug[ust] 23, 2013." *Id.* ¶ 6.  He also opines there "is no way to know whether there were obstructive elements, such as

7

bird feces, on the street camera" on that date.  *Id.* ¶ 7.  The camera in question is a "pan/tilt/zoom camera that can be adjusted from Vallejo Police Station," and "[t]here is no way to know whether the street camera . . . was pointed in the correct position" to view the incident on August 23, 2013.  *Id.* ¶ 8.  The camera "was working when checked in January 2014."  *Id.* ¶ 9.  Taylor testified "[t]he street cameras in 2013 were of low quality and were the first version of street cameras in Vallejo," these cameras "did not always work" and "maintenance on them was an issue at times."  *Id.* ¶ 10.

Taylor's testimony also touched on retention of video footage and officers' viewing or obtaining that footage.  *See id.* ¶¶ 11-12.  Generally, "street camera video footage gets over-written at approximately 30 days where in the footage is purged" and "ceases to exist."  *Id.* ¶ 11.  "The [police department] policy is that the officers request the video footage by the 14-day mark, but officers can generally request footage for at least 30 days."  *Id.*  Although video footage "may sometimes exist for more than 30 days depending on available storage space on the server," there is no way to know "whether there was sufficient storage space . . . to store the video footage, if any, from Aug[ust] 23, 2013."  *Id.*  Although patrol officers often asked Taylor to pull video footage, there is "a terminal at the police station where an officer with access"—that is, access via login and password—can view video footage from the public safety cameras "at the police station."  *Id.* ¶ 12.  Taylor confirmed that terminal was present in 2013, but he does not know whether patrol officers had access or had a duty to view or pull the footage.  *Id.*

Taylor first looked for video footage of the crash scene at the request of Special Agent Vallerga in January 2014 and found no footage from that day; "it has been purged."  *Id.* ¶ 11.

### C.  <u>Unidentified Witness: Suspect Running West Bound on Louisiana Street</u>

A transcript of Vallejo Police Department's radio dispatch tape from the day of the incident records a voice stating, "Hey he made it out of the perimeter, he was running uh west bound on Louisiana [Street]."  Dispatch Tr. at 04:52, ECF Nos. 184-3, 187-1.  When asked if that running was just now, that same voice stated, "Well according to the witness."  *Id.* at 05:02.  The parties stipulated that Vallejo Police Department Officer Ritzie Tolentino was the officer who

said a witness saw the perpetrator running westbound on Louisiana Street, and Tolentino did not take down the name of that witness. Hr'g Tr. (Aug. 23, 2017) at 8:18-9:17, ECF No. 199.

Tolentino testified that he was part of setting up a perimeter to box in the suspect who had fled from the crash scene. H'rg Tr. (Aug. 30, 2017) at 182:17-24. Tolentino believed he responded "in the area of either Monterey and Louisiana or Broadway and Louisiana." *Id.* at 183:4-6; *see also id.* at 187:17-19. Although Tolentino confirmed it was his voice from the dispatch transcript at 4:52 and 5:02, *id.* at 185:1-23, he could not recall a witness telling him the information he relayed to dispatch or anything about that witness. *Id.* at 185:24-186:15. Tolentino did acknowledge part of his job involves calling in information to dispatch, and he "couldn't tell if [the witness's information was] credible or not." *Id.* at 187:4. Tolentino acknowledged that people make mistakes about directions when giving him information, and even officers make that mistake. *Id.* at 187:5-11. Tolentino did not go to the crash scene, the carjacking site, or the barbershop on Tennessee Street where Williams was detained. *Id.* at 187:20-25. Tolentino did not personally witness anyone running out of the perimeter or a suspect running west on Louisiana Street, and he did not interview any eyewitnesses that day. *Id.* at 188:1-11. Tolentino had to attend to a stabbing call after radioing in the information he provided to dispatch in connection with this case. *Id.* at 188:16-18. According to Tolentino, it was his practice to write a report if he believed information was credible or if an officer tells him to write a report. *Id.* at 188:22-25. Tolentino did not write a report here; he "had to leave the scene right away," "did not get any information whatsoever" and "had no way of validating if that [witness's information] was true or not." *Id.* at 189:1-9. Tolentino does not consider the two lines he called out over the radio as reflecting a situation requiring that he take a witness statement. *Id.* at 196:23-197:3. The first report related to the new, urgent stabbing call does not show up until 6:03 on the dispatch transcript. *Id.* at 195:22-25.

Police Officer Jared Jaksch testified at hearing that he recalled a dispatch call about the witness Tolentino encountered and that information did not affect Jaksch's course of action in the case. Hr'g Tr. (Aug. 23, 2017) at 104:9-14. Jaksch explained the information did not affect the officers' course of action because "if the person had run westbound on Louisiana

Street, the next street they would have come out to is Broadway" and either the helicopter or another perimeter officer had advised "no one had come out on Broadway." *Id.* at 104:15-22. Additionally, that route "would be an odd route for someone to take, with all the police activity going on right there, to run back to the location of the police activity." *Id.* at 104:24-105:2. Jaksch further testified, "I felt like that was probably misinformation, either unintentional or intentional." *Id.* at 105:2-3. Jaksch repeated he did not believe the information was credible, and part of his job is to separate information from misinformation, including "where people will try to direct you the opposite way a suspect has been fleeing." *Id.* at 105:4-13.

Police Officer Jesse Hicks also testified that sometimes people provide inaccurate information on purpose, sometimes witnesses mix up west and east, and officers must assess information and determine the next course of action in a dynamic, fast-moving investigation. *Id.* at 61:24-62:16. Hicks testified he tracked down as many eyewitnesses as he could that day that were relevant to the investigation. *Id.* at 62:19-21.

III.     LEGAL STANDARDS

A. Federal Rule of Criminal Procedure 16(a)(1)(E)

Under Rule 16, a criminal defendant has a right to inspect all "documents, data, photographs, [or] tangible objects" within the government's "possession, custody, or control" that are "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E). Evidence is "material" under Rule 16 if it would be helpful to the development of a possible defense. *United States v. Budziak,* 697 F.3d 1105, 1111-12 (9th Cir. 2012) (citing *United States v. Olano,* 62 F.3d 1180, 1203 (9th Cir.1995)). "A defendant must make a "threshold showing of materiality" to compel discovery under Rule 16(a)(1)(E). *Id.* at 1111. "Neither a general description of the information sought nor conclusory allegations of materiality suffice; a defendant must present facts which would tend to show that the Government is in possession of information helpful to the defense." *Id.* at 1111-12 (internal quotations and citations omitted).

B. *Brady v. Maryland*

In *Brady v. Maryland,* 373 U.S. 83, 86 (1963), the Supreme Court recognized a prosecutor's obligation to reveal exculpatory evidence, whether substantive or for impeachment

10

purposes, when such evidence is "material" to the defense and in possession of the government. *See also Giglio v. United States,* 405 U.S. 150, 154–55 (1972) (disclosure of impeachment information). Evidence is "material" to the defense if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 681 (1985). In sum, there are three components of a *Brady* violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281-82 (1999). "Even if evidence is merely 'favorable to the accused,' its suppression violates *Brady* if prejudice results." *Gantt v. Roe,* 389 F.3d 908, 912 (9th Cir. 2004). "The government has no obligation to produce information which it does not possess or of which it is unaware." *Sanchez v. United States,* 50 F.3d 1448, 1453 (9th Cir. 1995).

C. Discovery Order Violation

Under Federal Rule of Criminal Procedure 16(c)(2), "[a] party who discovers additional evidence or material before or during trial must promptly disclose its existence to the other party or the court" if "the court ordered[] its production." Under Rule 16(d)(1), the court "may, for good cause . . . grant other appropriate relief" to regulate discovery, and it may "enter any other order that is just under the circumstances." Fed. R. Crim. P. 16(d)(2)(D). The Ninth Circuit has recognized Rule 16(d)(2) as providing a "broad allowance to prescribe any sanction that is 'just.'" *Ordonez v. United States*, 680 F.3d 1135, 1140 (9th Cir. 2012). The sanction chosen should not be "harsher than necessary to accomplish the goals of Rule 16," *United States v. Gee,* 695 F.2d 1165, 1169 (9th Cir.1983), or "disproportionate to the conduct of counsel," *United States v. Aceves–Rosales,* 832 F .2d 1155, 1157 (9th Cir.1987).

D. *Trombetta* and *Youngblood*

The government's alleged failure to preserve evidence, on the other hand, falls under the test established in *California v. Trombetta*, 467 U.S. 479 (1984), and *Arizona v. Youngblood*, 488 U.S. 51 (1988). Under *Trombetta*, the government's failure to preserve

evidence violates a defendant's due process rights if the unavailable evidence "possess[ed] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." 467 U.S. at 489. Later, in *Youngblood*, the Supreme Court added a third requirement for establishing a due process violation, holding that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." 488 U.S. at 58; *see also Miller v. Vasquez*, 868 F.2d 1116, 1120 (9th Cir. 1989) ("[A] bad faith failure to collect potentially exculpatory evidence would violate the due process clause."). "*Youngblood*'s bad faith requirement dovetails with the first part of the *Trombetta* test: that the exculpatory value of the evidence be apparent before its destruction." *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993). "The presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed." *Id.*

IV.    DISCUSSION

    A. Rule 16

    Williams asserts the government has failed to discover and disclose the name of a witness stating someone ran westbound on Louisiana Street and the government failed to preserve street camera video footage at the crash intersection; these failures, he says, violate Federal Rule of Criminal Procedure 16(a)(1)(E). Mot. at 10; Reply at 3-4. The government contends it is not obligated under Rule 16(a)(1)(E) to obtain or discover information it does not possess. Opp'n at 12-13.

    The government is correct. Rule 16(a)(1)(E)[1] covers any "papers, documents, data, photographs, tangible objects . . . or portions of any of these items" "within the

---

[1] The full text of Rule 16(a)(1)(E) is as follows: "Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and: (i) the item is material to preparing the defense; (ii) the government intends to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant."

12

government's possession, custody, or control." *See United States v. Gatto*, 763 F.2d 1040, 1049 (9th Cir. 1985) (holding "the triggering requirement under [R]ule 16[(a)(1)(E)] is that the papers, documents, and tangible objects be in the actual possession, custody or control of the government").[2] "Under *Gatto*, state-gathered evidence becomes subject to the disclosure obligation established by Rule 16(a)(1)(E) when it passes into federal possession." *United States v. Fort*, 472 F.3d 1106, 1118 (9th Cir. 2007).

### 1. Video Recordings

Williams's own argument stresses "[t]he government's failure to preserve relevant video recordings." Mot. at 9-10. If the government has failed to preserve any pre-existing, relevant video recordings, then those recordings cannot be within the government's possession, custody, or control. Here, Taylor's stipulated testimony establishes that BATF Special Agent Vallerga requested video footage from Vallejo in January 2014, shortly after the federal indictment issued here. But as of January – and even as of November 2013 when the indictment was filed -- any footage from the August 23, 2013 crash had "been purged." Taylor Test. ¶ 11. Any street camera video footage cannot fall under Rule 16(a)(1)(E) because it never passed into federal possession.

Nor does a lack of government diligence support Williams's requested relief under Rule 16(a)(1)(E). The Ninth Circuit has refused to extend the "due diligence" requirement found elsewhere in Rule 16's text to the requirement that the government provide a defendant documents or other tangible objects. *Gatto*, 7963 F.2d at 1048 ("Because we find no due diligence language in [R]ule 16[(a)(1)(E)] at all, nor any special reason to deviate from its plain language, we conclude that it triggers the government's disclosure obligation only with respect to documents within the federal government's actual possession, custody, or control."); *compare* Fed. R. Crim. P. 16(a)(1)(B)(i) (requiring "due diligence"), *with id.* at 16(a)(1)(E) (no due diligence requirement); *see also United States v. Chavez-Vernaza*, 844 F.2d 1368, 1375 (9th Cir.

---

[2] At the time of *Gatto,* Rule 16(a)(1)(E) was numbered 16(a)(1)(C). Rule 16 was renumbered in 2002. *See* Fed. R. Crim. P. 16 advisory committee's note, 2002 Amendments ("Current Rule 16(a)(1)(B), (C), (D), and (E) have been relettered."); *United States v. Fort*, 472 F.3d 1106, 1118 & n.11 (9th Cir. 2007).

1987) (recognizing conclusion in *Gatto* "that the federal government had no duty to obtain from

state officials documents of which it was aware but over which it had no actual control"). Rule

16(a)(1)(E) does not apply to the government's alleged failure to preserve video evidence. Thus,

any government failure to preserve any street camera video here does not fall under Rule

16(a)(1)(E).

### 2. Unidentified Witness

Although a defendant is entitled to the names of witnesses the government does

not intend to call as witnesses at trial, *United States v. Cadet*, 727 F.2d 1453, 1469 (9th Cir.

1984), Williams has not shown that the government possesses the name and identifying

information of the witness who informed Officer Tolentino the suspect ran westbound on

Louisiana Street. Instead, the evidence here shows Tolentino did not get the witness's name or

write a report based on that witness's information, "did not get any information whatsoever" and

"had no way of validating if that [witness's information] was true or not." Hr'g Tr. (Aug. 30,

2017) at 189:1-9. The government therefore does not have the witness's name or identifying

information in its possession, custody, or control, and as noted above diligence in obtaining the

information is not required under Rule 16(a)(1)(E).

The court therefore DENIES Williams's motion to the extent it is based on alleged

violations of Rule 16(a)(1)(E).

### B. Possible *Brady* Claims

Williams separately contends the government violated its obligation to disclose

exculpatory evidence by failing to disclose video forage and the identity of the witness who stated

someone ran westbound on Louisiana Street. Mot. at 8; Reply at 3, 5.[3] The government contends

"there is no evidence that the [g]overnment has evidence discoverable under *Brady* that [it] is

refusing to provide, or evidence within its duty to learn about." Opp'n at 9.

---

[3] Although Williams does not explicitly assert a *Brady* violation for the government's
failure to turn over any possible street camera video footage, Williams at hearing indicated he
was "not conceding either a *Brady* violation or Rule 16 violation or a violation of the Court's
discovery order." Hr'g Tr. (Oct. 4, 2017) at 41:5-7. The court therefore also addresses the
possibility of a *Brady* violation for an alleged failure to turn over any possible street camera video
footage.

14

Williams's contentions fail because he has not shown "willful or inadvertent" suppression by the government of street camera video footage or the information identifying the unknown witness. The Supreme Court has held that "*Brady* suppression occurs when the government fails to turn over even evidence that is 'known only to police investigators and not to the prosecutor.'" *Youngblood v. West Virginia*, 547 U.S. 867, 869-70 (2006) (per curiam) (quoting *Kyles v. Whitley*, 514 U.S. 419, 438 (1995)).

### 1. Video Recording

Williams has not shown the government failed to turn over evidence known by Special Agent Vallerga, anyone at the Vallejo Police Department or by the prosecution here. The government has turned over evidence clarifying law enforcement's awareness of any possible street camera video footage of the crash. *See* Ex. C at 2 (Vallerga interview of Jaksch where Jaksch explains he "believed that there may be one [camera] at the intersection of Broadway and Tennessee," but "they don't often work and that he cannot recall if it was checked for any recording the incident."); Hr'g Tr. (Aug. 23, 2017) at 46:21-47:7, 63:19-22, 64:3-12 (Hicks testifying to his awareness of a camera at the intersection but no awareness of the camera working that day or checking for any video footage of the collision); Taylor Test. ¶ 11 (stipulated testimony that as of January 2014, the video footage from August 23, 2013 was no longer retained). Williams has not shown that "the government failed to disclose the relevant information in the possession of *any* of its agents involved in [Williams's] prosecution." *United States v. Price*, 566 F.3d 900, 908 (9th Cir. 2009) (emphasis in original); *see also United States v. Hsieh Hui Mei Chen*, 754 F.2d 817, 824 (9th Cir. 1985) (observing the government "has no duty to volunteer information that it does not possess or of which it is unaware"); *United States v. Sukumolachan*, 610 F.2d 685, 687 (9th Cir. 1980) (stating *Brady* "does not require the government to create exculpatory material that does not exist"); *United States v. Stallworth*, 656 F.3d 721, 731 (7th Cir. 2011) (finding "no indication that the government has suppressed any evidence at all" where the government "turned over all the recordings it had"). No evidence before the court suggests a government agent or prosecutor possessed actual street camera video footage and withheld it.

### 2.  Unidentified Witness

Likewise, Williams has not shown a failure to turn over information about the witness who informed Tolentino someone "was running uh west bound on Louisiana."  Dispatch Tr. at 04:52.  The parties stipulated Tolentino was the officer who said a witness saw the perpetrator running west on Louisiana Street.  Hr'g Tr. (Aug. 23, 2017) at 8:18-9:17.  Tolentino testified and was subject to cross-examination by Williams's counsel.  Hr'g Tr. (Aug. 30, 2017) at 189:18-196:9 (Tolentino cross-examination).  As noted above, Tolentino did not write a report for this incident; he "did not get any information whatsoever" about the witness and "had no way of validating if that [witness's information] was true or not."  *Id.* at 189:1-9.  Williams has not met his "initial burden of producing some evidence to support an inference that the government possessed or knew about" the witness's name and other identifying information.  *Price*, 566 F.3d at 910; *see also Sanchez*, 50 F.3d at 1453 ("The government has no obligation to produce information which it does not possess or of which it is unaware.").

The court therefore DENIES Williams's motion to the extent it is based on alleged *Brady* violations.

### C.  Discovery Order

Williams asserts the government violated its obligations under *Brady* and the magistrate judge's discovery order, which required the government to "ask the Vallejo Police Department to . . . confirm the identity of the witness referenced in the record."  ECF No. 182 at 1; *see* Mot. at 8.  In reply, Williams also asserts the government's "failure to identify the officer and witness referenced at 4:52 of the radio dispatch tape violated the magistrate judge's discovery order and Rule 16."  Reply at 4.  The parties' stipulation that Tolentino was the officer who said a witness saw the perpetrator running westbound on Louisiana Street.  Hr'g Tr. (Aug. 23, 2017) at 8:18-9:17, moots the motion with respect to identifying the officer.  And as discussed above, the government never possessed the witness's name or identifying information, nor could the government obtain that information, as Tolentino did not take down the name of that witness.  *Id.*

Williams's citation to *Washington v. Texas*, 388 U.S. 14, 19, 23 (1967), does not assist him here.  In *Washington*, a witness who was previously convicted of the same crime as

16

defendant was prevented from testifying based on a state statute. *Id.* at 16-17. But that witness was known, the defendant testified on his own behalf about that witness's participation in the crime, and the witness "was physically and mentally capable of testifying to events that he had personally observed." *Id.* at 16-17, 23. Here, the absence of evidence of any knowledge of the name or other identifying information of the unknown witness undermines any argument the government has denied a known witness to Williams. *Cf. United States v. Finley*, 301 F.3d 1000, 1018 ("Exclusion [of testimony] is an appropriate remedy for a discovery rule violation only where 'the omission was willful and motivated by a desire to obtain a tactical advantage.'") (emphasis omitted, internal quotation marks and citation omitted).

To the extent Williams's motion is based on the magistrate judge's order, it is DENIED.

D. *Trombetta* and *Youngblood* Claims

Under *Trombetta* and *Youngblood*, Williams must show evidence the government failed to preserve: (1) had apparent exculpatory value before it was destroyed; (2) was not preserved due to bad faith; and (3) was "of such a nature that [Williams] would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489; *Youngblood*, 488 U.S. at 58. The question is whether the unavailable street camera video recordings and the unidentified witness meet this test.

1. Street Camera Video Recordings

Williams asserts "the government's failure to preserve relevant video recordings from the Vallejo traffic cameras violated Williams's due process rights and his constitutional right to present a complete defense." Mot. at 10. The government contends it has exhibited no bad faith and the video footage might not even have existed. Opp'n at 11-12.

a) Apparent Exculpatory Value

Specifically, Williams asserts, "Vallejo police were alerted to the potential usefulness of the Broadway and Tennessee video footage on the day of the alleged carjacking" because "[n]o witness positively identified Williams." Reply at 7. Williams focuses on the failure of Adam G., the victim, to identify Williams as the suspect. *Id.* The government asserts "[t]he

17

footage may never have existed" based in part on Jaksch's statements that the cameras often do not work. Opp'n at 11.

As explained below, the court finds the evidence does not show street camera footage, if it existed, had any apparent exculpatory value before the video would have been routinely purged by the Vallejo Police Department from its storage server. The evidence before the court taken as a whole, shows that local law enforcement would have had little reason on the day of the incident to believe Williams was not the suspect. Despite one sketchy account of someone running westbound, discussed further in detail below, police officers encountered Williams in a barbershop that Miguel C. said the suspect had entered. Williams's physical description was not inconsistent with the relatively consistent descriptions provided by the victim and other witnesses, including Miguel C., Adam G. and Denise H. Hr'g Tr. (Aug. 23, 2017) at 24:9-24 (Hicks Test.); Hr'g Tr. (Aug. 30, 2017) at 149:10-24, 168:20-23, 169:15-18 (Greenberg Test.); Ex. 3 at 3-4. Still, other witnesses had indicated to officers that someone of interest was in the barbershop. Of the two people in the barbershop, one was an employee who was too tall to match witness descriptions of the suspect, and the other person more closely matched the suspect's description. Police officers found a gray hooded sweatshirt on the floor of the barbershop. And Hicks found a silver-barreled, black-handled handgun, matching the victim's detailed description, in Williams's waistband. Although Williams directs the court's attention to the inability of Denise H. to identify Williams in one field show up and of victim Adam G.to identify him in a photo lineup, Williams does not credit Miguel C.'s identification, however qualified: "Yes, that looks like him. His face looks the same. I think that's him." H'rg Tr. (Oct. 4, 2017) at 17:4-17, 18:1-4 (Brown Test.). Officers testified credibly to their belief that this was a positive identification of the suspect. *Id.* at 32:21-23 (Brown Test.); Hr'g Tr. (Aug. 30, 2017) at 27:17-23 (Greenberg Test.); *see, e.g.*, *United States v. Ellis*, No. 13-CR-00818 PJH, 2015 WL 6551628, at *5 (N.D. Cal. Oct. 29, 2015) (witness, though not "100% certain," did show "some level of certainty" in identifying defendant from photo lineup as driver of getaway car when compared with "the uncertain identification of" a different individual as the driver during photo lineup the day before; witness later identified defendant four months later in a video lineup

18

including side profiles with a statement, "I think number four resembles the driver" and a "?" on the identification sheet); *see also Jacobs v. McDonald*, No. CV 10-6322-DSF OP, 2012 WL 3206227, at *10 (C.D. Cal. Apr. 24, 2012), *report and recommendation adopted*, No. CV 10-6322-DSF OP, 2012 WL 3206533 (C.D. Cal. Aug. 6, 2012) ("[T]he evidence showed that . . . [a witness] previously identified [p]etitioner" as the shooter where the witness "identified [p]etitioner as the shooter from photographs, immediately selecting [p]etitioner's photo and saying, 'That looks like him'; [the witness] told [the officer] that she got a good look at the perpetrator . . . .").

Both parties cite to *United States v. Zaragoza-Moreira*, 780 F.3d 971 (9th Cir. 2015), to support their arguments regarding the exculpatory value of any video recordings. There, a defendant stood in a line for admission into the United States from Mexico. *Id.* at 974. Based on a computer-generated referral, an officer prepared to pat down the defendant before she blurted out she had packages on her. *Id* at 975. An officer discovered a package of heroin and a package of methamphetamine on the defendant's person. *Id.* A Homeland Security Investigations Agent interviewed the defendant. *Id.* The defendant informed the agent she suffered cognitive problems from being shot multiple times, including in the head, and the defendant had been forced to sniff drugs in the past 24 hours that made her "feel weird." *Id.* The defendant informed the agent, "Yeah, I made it obvious. I was making—I wanted to be known. I didn't want to do it." *Id.* She was not paid to transport drugs into the United States; she merely wanted to go home. *Id.* She had run out of money and was pressured by two men in a drug cartel to transport the drugs. *Id.* The defendant insisted that while standing in line, she wanted authorities to notice her, tried to attract attention by "making a lot of noises" and made herself "obvious." *Id.* The defendant stated one of the cartel men and a woman accompanying her pulled her out of line earlier that same morning because "she had purposely tried to loosen the packages of drugs that were attached to her body." *Id.* at 976. She "wiggled around," "patted her stomach," and "threw her passport on the ground" to draw attention to herself." The woman accompanying the defendant told her to "calm down" because she was "making it obvious." *Id.* The cartel men allegedly stated to the defendant that if she transported these drugs, "nothing's

going to happen to [her] daughter or [her] mother." *Id.* The defendant even demonstrated to the agent "the motions she allegedly made to indicate to border agents that 'there was something wrong with me' . . . ." *Id.* at 979.

Despite the wealth of detailed information the defendant directly provided to the agent interviewing her, the agent "'overlooked' retrieving the video footage because it was 'just something I didn't think about doing.'" *Id.* The agent admitted "she understood that a defendant who is threatened or forced to commit a crime has a possible defense," and also that the line the defendant stood in "was under constant video surveillance," video which the agent "had the ability to review and preserve." *Id.* at 980. Yet the agent "made no attempt to view or preserve the . . . video before it was destroyed." *Id.* The Ninth Circuit reasoned the agent "recognized the importance of Zaragoza's statement that [another woman] was with her in the pedestrian line." *Id.* at 979. The agent asked a question about this "numerous times, confirming [the defendant's] answer, which she would not have done if she thought the answer was inconsequential." *Id.*

Here, unlike the agent in *Zaragoza*, there is no evidence the officers in this case received any information from Williams suggesting he was not the suspect. Although the one unidentified witness stated the suspect ran westbound, a witness at the collision scene, Miguel C., said he had followed the suspect and saw him enter the barbershop. Other witnesses and the victims gave descriptions relatively consistent with that of Miguel C., and Williams's appearance was the best match to that description of those persons located in the barbershop. Despite the fact that Denise H. did not identify Williams as the suspect that day and Adam G. did not identify Williams in a photo lineup, Miguel C. provided what officers believed was a positive identification of Williams. Hr'g Tr. (Oct. 4, 2017) at 32:21-23 (Brown Test.); Hr'g Tr. (Aug. 30, 2017) at 27:17-23 (Greenberg Test.). As Officer Greenberg testified, a witness or victim "fairly often" does not select the subject based on his "conservative estimate" of the 30 in-field show-ups he has conducted in his career. Hr'g Tr. (Aug. 30, 2017) at 154:20-155:4 (Greenberg Test.). Any exculpatory value of video camera footage of the crash would have been even less apparent to officers after they recovered a handgun from Williams's waistband that closely matched the detailed description of the handgun provided by the carjacking victim. In sum, the officers did

not face repeated indications of the possible exculpatory value of camera footage from the crash scene. *See, e.g.*, *Cooper*, 983 F.2d at 931 (9th Cir. 1993) (finding the exculpatory value of destroyed evidence apparent where the "equipment's value as potentially exculpatory evidence was repeatedly suggested to government agents," including "claims of legitimacy" from the small chemical laboratory and its landlord that "the equipment was specially configured for legitimate chemical processes and was structurally incapable of methamphetamine manufacture")

Moreover, no evidence indicates Williams put officers on notice of an alibi or mistaken identity defense any time before he was indicted on November 7, 2013, more than 60 days after the carjacking and crash. Williams therefore did not "alert the [g]overnment that he had any interest in the" camera footage before the storage server would have been purged of any available footage. *United States v. Salas*, No. 14-CR-00413-JSW-1, 2016 WL 3456693, at *5-6 & n.6 (N.D. Cal. June 24, 2016) (distinguishing defendant's denial of selling firearms from statements in *Zaragoza* and reasoning his statements "would not have clearly alerted . . . [a]gents to a potential entrapment defense") (citing *United States v. Vera*, 231 F. Supp. 2d 997, 1000 (D. Ore. 1997)); Taylor Test. ¶ 11 (Generally, "street camera video footage gets over-written at approximately 30 days wherein the footage is purged" and "ceases to exist.").

Additionally, any camera footage has only speculative exculpatory value. Williams has not put forth anything suggesting the video "may have shown that Williams was not the driver of the stolen Mustang." Mot. at 10; *see United States v. Drake*, 543 F.3d 1080, 1090 (9th Cir. 2008) ("The exculpatory value of an item of evidence is not 'apparent' when the evidence merely '*could have*' exculpated the defendant") (emphasis added in *Drake*) (citing *Youngblood*, 488 U.S. at 56); *Crawford v. Foulk*, No. 214CV1464EFBPTEMP, 2016 WL 4120613, at *9 (E.D. Cal. Aug. 1, 2016) ("[T]he mere possibility that examination of the [missing] videotape may possibly have revealed exculpatory evidence is simply not enough to satisfy the *Trombetta* standards."). Williams's reliance on the witness tip to Tolentino that a suspect ran west on Louisiana Street does not support his claim that the video "may have shown" he was not the driver of the carjacked vehicle. Indeed, the camera footage, if it ever existed and had been retained, could have inculpated Williams. *See, e.g.*, *Ford v. McDonald*, No. ED CV 09-

0275, 2010 WL 3929454, at *10 (C.D. Cal. July 23, 2010), *report and recommendation adopted*, No. ED CV 09-0275, 2010 WL 3929453 (C.D. Cal. Oct. 2, 2010) (finding assertion that recording of witness "might have revealed [the witness] said something completely different" from his trial testimony was "unadulterated speculation" because "recording might have contained additional evidence that would *inculpate*, and not exculpate, [p]etitioner") (emphasis in original).

b) <u>Bad Faith</u>

Williams argues the government has exhibited bad faith because multiple officers conceded they were aware that the Vallejo Police Department employed multiple street cameras, including a street camera at the crash intersection, and yet "no one checked or preserved [camera] footage until it was too late." Reply at 7. The government contends it has not acted in bad faith because it "adopted this case well after the period for purging such footage had lapsed," and BATF Agent Vallerga "nevertheless tried to locate the footage" despite being unsuccessful. Opp'n at 11 (citing Ex. 2).

The court finds no evidence of bad faith here. First, "[t]he presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed, because without knowledge of the potential usefulness of the evidence, the evidence could not have been destroyed in bad faith." *Zaragoza*, 780 F.3d at 977. Having found no apparent exculpatory value, the court cannot find bad faith in the failure to retain any camera footage.

Second, although Williams cites to *Zaragoza* in his argument, the government agent's behavior there exhibited bad faith in a number of ways. In *Zaragoza*, the agent authored four separate reports but only included the defendant's statements "about being coerced into transporting the drugs and trying to attract law enforcement attention while in the pedestrian line" in the one report "prepared shortly before the district court's hearing on Zaragoza's motion to dismiss." 780 F.3d at 980. The agent's "probable cause statement supporting the criminal complaint that was presented to the magistrate judge did not include any reference to [defendant's] claims of duress." *Id.* The agent's follow-up investigation signaled more bad faith:

22

Despite confirming the defendant had crossed the border with another woman who she alleged coerced her, the agent did not view or retain the available video evidence, which was "sufficient to establish that she made a 'conscious effort to suppress exculpatory evidence,' thereby acting in bad faith." *Id.* (citing *Trombetta*, 467 U.S. at 488).

Unlike the agent in *Zaragoza*, the officers here did not fail to report any potentially exculpatory statements by Williams; Williams has identified none. Officers did report over dispatch and in written notes that several victim and witness show ups did not identify Williams while one witness did. The follow-up investigation here, unlike that in *Zaragoza*, did not disclose a need to review camera footage of the crash intersection. Officers found Williams where a witness tracking the suspect stated he thought the suspect would be; Williams matched witness's descriptions more closely than the employee also in the barbershop; officers found a gray hooded sweatshirt lying on the floor in the barbershop; and officers found a silver-and-black handgun on Williams's person. One witness provided officers what they believed was a positive identification. Once federal investigators began working on the case, the federal BATF agent requested from local law enforcement any available video evidence, unlike the federal agent in *Zaragoza*. There simply is no evidence to support a conclusion that the government has withheld or knowingly suppressed or destroyed any evidence requested. *See Cooper*, 983 F.2d at 931 (finding bad faith where the government responded "to defense requests for return of the [allegedly legitimate] equipment" by stating "they held it as evidence" and repeating that statement "even after the equipment had been destroyed").

Other courts have found no evidence of bad faith where video, dispatch tapes, or even a blood sample, were destroyed subject to standard retention and disposal procedures. *See, e.g.*, *United States v. McChesney*, 871 F.3d 801, 810 (9th Cir. 2017) (finding government compliance with regular procedures should be regarded as an indication that the disposal of evidence was not in bad faith); *United States v. LeGrande*, 379 F. App'x 600, 601 (9th Cir. 2010) ("[T]he video was overwritten in accordance with prison policy and [defendant] presented no evidence that the footage was deliberately destroyed in order to further the government's case."); *United States v. Stallworth*, 656 F.3d 721, 731 (7th Cir. 2011) (rejecting *Brady* claim where

government turned over "all the recordings it had" and finding defendant had not established bad faith where police department "may have deleted the recording as a routine part of video record maintenance"); *United States v. Rodriguez*, No. 2:16-CR-00023 CKD, 2016 WL 3090791, at *4 (E.D. Cal. June 1, 2016) (finding defendant's argument "that other views of the lobby" from other surveillance cameras "might have shown activity explaining the defendant's actions (glancing around) before he picked up the sunglasses and put them in his pocket" unpersuasive); *United States v. Picou*, No. 1:14-MJ-00196-SAB-1, 2015 WL 520157, at *4 (E.D. Cal. Aug. 21, 2015) (observing "[t]here is no substantial evidence that the specific dispatch tapes in this case were nefariously targeted for deletion prematurely" where "the tapes appeared to have been overwritten in accordance with the normal practice of recording over tapes after approximately 90 days" and defendant "had not specifically requested production of the tapes" before deletion); *United States v. Alcaraz*, No. 2:13-CR-189-KJD-CWH, 2014 WL 3953177, at *20 (D. Nev. Aug. 13, 2014) (concluding there was insufficient evidence to find bad faith by the government where video recordings "were not retained in the ordinary course of business of [police] because they belonged to [a] private company" and were "not in the possession of [police]" because the possible evidence, "if the evidence existed," was part of "a temporary test"). Here, the court observes no evidence of a "calculated effort to circumvent disclosure requirements" in the government's failure to preserve any existing camera footage, and no evidence suggests any footage was destroyed by any action other than the passage of time beyond Vallejo Police Department's standard retention of camera footage on its servers for 30 days. *Trombetta*, 467 U.S. at 488; Taylor Test. ¶ 11.

### c)  No Other Comparable Evidence

Williams asserts it is untenable to require that he testify to an alibi at trial, because such a requirement "runs afoul of his Fifth Amendment right against self-incrimination" and his testimony would not be comparable to video footage of the suspect leaving the crash seen. Reply at 7-8.  The video footage, he argues, "may have shown that Williams was not the driver of the stolen Mustang."  Mot. at 10.  According to the government, "[t]here is no 'lost' evidence for [Williams] to replicate here."  Opp'n at 12.  The government, in suggesting Williams can assert

24

an alibi defense as an alternative to showing video footage, refers both to "his own testimony or that of other individuals" as potentially comparable evidence. *Id.*

On this prong of the *Trombetta/Youngblood* test, Williams has the better argument. The government's argument is analogous to that the Ninth Circuit faced and rejected in *Zaragoza*. There, the court observed "obvious Fifth Amendment implications triggered by the government's argument." *Zaragoza*, 780 F.3d at 981. Also, although Williams does not have the cognitive disability exhibited by Zaragoza, as in her case, her "self-serving testimony . . . would not be comparable to video footage that recorded her actions . . . ." *Id.*

### d) Conclusion

The absence of comparable evidence notwithstanding, Williams has not shown bad faith or that the potential exculpatory value of the video camera footage was apparent to the government, as explained above. The court DENIES Williams's motion to dismiss the indictment based on the government's alleged failure to preserve the street camera video footage.

### 2. Unidentified Witness

Williams contends the government violated his Fifth and Sixth Amendment rights "by failing to discover and disclose the name and identifying information of the witness who told police that the carjacking suspect fled west on Louisiana outside the police perimeter." Mot. at 7. The government disputes that Williams has shown the apparent exculpatory value of this witness's identifying information, that Officer Tolentino failed to gather this information in bad faith, and that Williams lacks comparable evidence to present at trial. Opp'n at 5-7, 10-12. The court addresses these contentions below.

### a) Apparent Exculpatory Value

Williams asserts "[t]he radio dispatch tape establishes that the Vallejo police spoke to the witness and knew he provided exculpatory statements." Mot. at 7. The government contends "[t]here is no indication that the individual seen running had anything to do with this incident, or conversely, was a person other than [Williams]." Opp'n at 5. Additionally, because "there is no indication of what the witness would say," there is "no indication of whether it would be inculpatory, exculpatory, or irrelevant." *Id.* at 10.

25

Williams has not shown the apparent exculpatory value of this witness's statement to police at the time. Police received a number of tips from other witnesses, including a witness who was involved in the car crash with the carjacking suspect, all of whom indicated the carjacking suspect ran east and entered the barbershop. The police were responding to a fast-developing situation based on the information they received and then communicated with each other. After discovering Williams in the barbershop, recovering a firearm from Williams that matched the one described by the victim, and receiving other corroborating witness testimony, the exculpatory value of a single witness's name and information identifying who might have said the suspect ran in a different direction would not be apparent to the officers, including other officers listening to Tolentino's radio statements, as discussed further below. *Cf. Rodriguez*, 2016 WL 3090791, at *4 (finding surveillance footage of "other views" of the crime scene "did not possess exculpatory value that was apparent before it was destroyed").

Any exculpatory value of this witness's identity would have been least apparent to Tolentino at the time he could have obtained that information because he was not at the crash scene talking to eyewitnesses, did not go near the barbershop, and did not encounter Williams directly. *Cf. Zaragoza*, 780 F.3d at 979-80 (observing video evidence had apparent exculpatory value to agent who asked defendant about someone accompanying her in line to cross border, had heard repeatedly about the companion and others defendant said were coercing her, had heard repeatedly from defendant about her attempts to "be obvious" to law enforcement that she was carrying illegal drugs, had confirmed that a person did accompany defendant in line and was aware of video surveillance of line in which defendant stood); *Cooper*, 983 F.2d at 931 (9th Cir. 1993) (finding the exculpatory value of destroyed evidence apparent where the "equipment's value as potentially exculpatory evidence was repeatedly suggested to government agents," including "claims of legitimacy" from the small chemical laboratory and its landlord that "the equipment was specially configured for legitimate chemical processes and was structurally incapable of methamphetamine manufacture").

Officer Jaksch also testified to the lack of apparent exculpatory value of the single witness statement to him during the course of searching for the carjacking suspect, stating that

information did not affect Jaksch's course of action in the case. Hr'g Tr. (Aug. 23, 2017) at 104:9-14. "[I]f the person had run westbound on Louisiana Street, the next street they would have come out to is Broadway," and either the helicopter or another perimeter officer advised "no one had come out on Broadway." *Id.* at 104:15-22. Additionally, that route "would be an odd route for someone to take, with all the police activity going on right there, to run back to the location of the police activity." *Id.* at 104:24-105:2. Jaksch further testified to his belief that this "was probably misinformation, either unintentional or intentional." *Id.* at 105:2-3. Even to an officer more involved in the search for the suspect and detention of Williams at the barbershop, the exculpatory value of a single witness tip that contradicted the observations of other perimeter officers, helicopter surveillance and information from witnesses at the crash scene was not apparent. *Cf. again Rodriguez*, 2016 WL 3090791, at *4 (surveillance footage of "other views" of crime scene "did not possess exculpatory value that was apparent before it was destroyed").

b) Bad Faith

The government disputes any bad faith here as well, contending it "can do no more than provide Officer Tolentino's recollections, and so cannot be said to have acted in bad faith." Opp'n at 10. It says "Tolentino is available to testify" and the dispatch transcript "tends to support his recollections that he was focused on another incident and did not interview a purported second witness connected to [Williams's] case." *Id.*

Without this single witness's tip having apparent exculpatory value to any officers, the officers cannot have failed to record the witness's identifying information in bad faith. *See Zaragoza*, 780 F.3d at 977. The case law applicable to the government's alleged failure to preserve any camera footage applies here as well: there is no evidence that Tolentino purposefully omitted the witness's identifying information. *See Cunningham v. City of Wenatchee*, 345 F.3d 802, 812 (9th Cir. 2003) (holding officer's failure "to document his interrogations" or "keep a record of [witnesses'] statements denying sexual abuse" by defendant "may have been negligent or incomplete" but was not acting in bad faith because officer "likely believed his tactics were lawful"). Here, Tolentino, who responded to the call "as a perimeter unit," was not at "the exact location of the call." Hr'g Tr. at 182:17-24. Tolentino never went to the crash scene, the

27

carjacking site or the barbershop.  *Id.* at 187:20-25.  It is instructive that courts have refused to grant habeas relief where, as here, an officer did not record identifying witness information.  *See, e.g.*, *Guidry v. Cate*, No. SACV 12-1022-GHK AGR, 2014 WL 6609414, at *8-9 (C.D. Cal. Oct. 2, 2014), *report and recommendation adopted,* No. SACV 12-1022-GHK, 2014 WL 6612009 (C.D. Cal. Nov. 18, 2014) (declining to grant habeas relief where police detective could not recall name of officer who showed store employee a photographic lineup, officer who showed lineup could not write report and petitioner argued prosecution destroyed evidence of identity of store employee); *see also Moore v. Horel*, No. CIV S-02-0007 JAM DAD P, 2010 WL 2574092, at *19 (E.D. Cal. June 24, 2010) (finding "no evidence before this court that the unidentified [witness] could have provided exculpatory evidence at petitioner's trial, let alone any evidence that the police acted in bad faith in failing to preserve" evidence of eyewitness who purportedly stated petitioner was not subject where different witness testified eyewitness "never indicated petitioner was not the robbery suspect").

    The court does find the time between Tolentino's radioing in the witness tip to dispatch and his response to a subsequent stabbing incident too long to support the government's contention that Tolentino was "focused on another incident" while receiving the tip.  *Cf.* Hr'g Tr. (Aug. 30, 2017) at 195:12-25 (Tolentino acknowledging he was called to the other incident involving a woman with a knife a few minutes after receiving the witness tip) *with* Ex. 3 at 2-3, ECF No. 184-3 (showing time stamps of 05:02 for Tolentino's second statement about witness tip to dispatch and 06:03 as first report of woman with knife).  At the same time, there is no evidence of bad faith on the part of Tolentino, other officers or the government in failing to obtain this witness's identifying information.  *Cunningham,* 345 F.3d at 812 (no bad faith because officer "likely believed his tactics were lawful").

                    c)  No Other Comparable Evidence

    The government argues Williams does not lack other evidence comparable to this witness testimony, asserting "[i]f [Williams] wishes to look further for such an individual and interview him or her (if the person exists), [Williams] has that ability."  Opp'n at 5.  Specifically, the government argues Williams "has the same information and access to witnesses as the

Government," including "Tolentino's recollections, the dispatch, the various additional . . . reports, the ability to interview the percipient witnesses and agents, and the ability to try to find this purported missing individual." *Id.* at 12. Williams asserts the government's position "is puzzling," stating "[i]t is virtually impossible for the defense to locate this critical witness without [the witness's identifying] information"; he contends the government has failed to suggest "any other reasonably available evidence that would be comparable to the testimony of the witness who provided the exculpatory statement to . . . Tolentino." Reply at 4-5.

Williams does have access to other comparable evidence. Officer Tolentino was examined and cross-examined as part of the evidentiary hearing held with respect to this motion. Hr'g Tr. (Aug. 30, 2017) at 181:13-197:10. Although Tolentino could not recall anything about a witness at the time stating the suspect was running west on Louisiana outside of the police perimeter, Tolentino is a witness who can be cross-examined at trial about his words recorded in dispatch communications for the day of Williams's arrest. *See United States v. Gonzalez-Hernandez*, No. CR15-00267-TUC-RCC, 2015 WL 1600781, at *4 (D. Ariz. Apr. 8, 2015), *aff'd*, 657 F. App'x 658 (9th Cir. 2016) (observing comparable evidence available to defendant in the form of agents who "where at the scene and can be examined regarding their recollection of the content of the [lost or destroyed evidence]"). Williams may also seek to introduce the transcript of audio dispatch, as he has done for this motion. *See* ECF No. 187-1 at 1-10; *see also Picou*, 2015 WL 5020157, at *4 (observing comparable evidence available to defendant in the form of "rangers' reports" despite recording over of dispatch tapes).

d)  Conclusion

The court DENIES Williams's motion to dismiss the indictment as to the failure to gather and preserve this witness's name and identifying information.

/////

/////

/////

/////

/////

1    V.    <u>CONCLUSION</u>

2         For the foregoing reasons, Williams's motion to dismiss the indictment, ECF

3    No. 187, is DENIED.

4         IT IS SO ORDERED.

5    DATED:  April 19, 2018.

6

7                                        _____
                                         UNITED STATES DISTRICT JUDGE
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28